# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-414 (JEB)** |
| **v.** | : | |
| | : | |
| **ANDREW JOHNSON,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Andrew Johnson to 12 months of incarceration, 12 months of supervised release, a fine of $2,336, and $500 in restitution.

### I.        Introduction

Defendant Andrew Johnson, a 43-year-old handyman, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

On April 15, 2024, immediately prior to jury selection, Johnson pleaded guilty to Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

The government's recommended sentence is supported because Johnson (1) climbed over broken glass to enter the U.S. Capitol Building through an office window that had been smashed out; (2) encouraged other rioters to join him in the office; (3) engaged in disorderly and disruptive conduct on U.S. Capitol grounds for over 4 hours until he was appended by police for violating curfew; (4) prolifically spread false information about January 6, 2021 on social media after the riot; (5) called for a second January 6 over a year after his arrest; (6) showed neither meaningful candor nor remorse; (7) violated his conditions of release on at least ten separate occasions; and (8) has a long criminal history.

The Court must also consider that the defendant's conduct on January 6, 2021, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Johnson's crime support a sentence of 12 months of incarceration, 12 months of supervised release, a fine of $2,336, and $500 in restitution.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the summary of the attack on

the U.S. Capitol. *See* ECF No. 1-1 (Affidavit in Support of Criminal Complaint), at 1–2.

*Defendant Johnson's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Johnson attended the "Stop the Steal" rally outside the White House.

*See* Exhibit 1 (open-source photo below).[2]



After the rally, Johnson made his way to the U.S. Capitol grounds. While he marched to

the U.S. Capitol Building he used a bull horn to say: "We have a fucking job to finish." *See* Exhibit

2 (open-source video still at 00:06 below).

---

[2] To avoid confusion, the government has renumbered the exhibits referenced throughout this
sentencing memo instead of using the exhibit numbering previously marked in advance of trial.
These sentencing exhibits will be electronically transmitted to the Court and to the defendant.



Johnson then entered the restricted grounds and embedded himself in the crowd gathered on the west side. *See* Exhibit 3 (open-source photo separately provided). At approximately 2:40 p.m., rioters had pushed police back to the Lower West Terrace, where police defended an entrance to the U.S. Capitol known as the "Tunnel." *See* Exhibit 4 (CCTV video separately provided). Sometime before 4:00 p.m., Johnson made his way to the Lower West Terrace, left of the Tunnel, just below room ST-2M. *See* Exhibit 5 (open-source photo below).



At approximately 4:15 p.m., Johnson entered the U.S. Capitol Building through the window of room ST-2M that had been smashed out by other rioters. *See* Exhibit 6 (open-source photos below).

 

Once inside that room, Johnson was captured on open-source video yelling: "We haven't accomplished anything here. This door is still closed. We haven't accomplished anything yet. We haven't accomplished shit. We need to go through that fucking door. We're not done yet. We're not just breaking and entering." *See* Exhibit 7 (open-source video separately provided at 00:30–00:46). While in room ST-2M, Johnson waved to fellow rioters on the Lower West Terrace, in a manner that appeared to encourage more breaches of the U.S. Capitol Building. *See* Exhibit 8 (open-source video still at 00:02 below).



After exiting room ST-2M, while still on restricted grounds, Johnson continued to encourage other rioters by playing loud music on a boombox. *See* Exhibit 9 (open-source video separately provided, showing Johnson playing Uprising by Muse with the lyrics: "We will be victorious").

Around 5:00 p.m., law enforcement deployed tear gas and other chemical irritants to disperse the riot on the Lower West Terrace. *See* Exhibit 10 (body-worn camera footage separately provided). During this time Johnson regularly cursed and yelled at police officers, saying things like: "We are not fucking wrong. You want to give away our country. Are you fucking crazy. Are

you crazy. You guys are fucking crazy. . . . Fuck you." *Id.* (00:25–00:38); *see also id.* (still at 00:50

below).



    Johnson remained on restricted grounds for approximately two more hours, until a line of

police officers drove him westward to the Capitol Reflecting Pool. *See* Exhibit 11 (open-source

video separately provided). Based on his statements, Johnson was aware of the curfew imposed by

D.C. Mayor Muriel Bowser but nevertheless ignored that directive and continued to curse and yell

at police officers. *See* Exhibit 12 (open-source video separately provided, showing Johnson state:

"There's no curfew. Fuck your curfew"). Johnson only ceased his disorderly and disruptive

conduct once arrested around 8:00 p.m. near the Reflecting Pool. *See* Exhibit 13 (body-worn

camera footage still separately provided). Police officers confiscated pepper spray from Johnson

during his arrest. *See* Exhibit 14 (body-worn camera footage separately provided at 01:01–02:45).

*Defendant Johnson's Statements On Social Media*

While Johnson "did not provide information regarding any social media accounts" to the U.S. Probation Office ("Probation") for the presentence investigation report ("PSR"), *see* ECF No. 48 at ¶ 62, since his guilty plea, Probation indicated that Johnson has continued to call himself an "American Terrorist" on social media and states that he is a "Proud j6er" in reference to January 6, 2021. *See id.* at ¶ 21; Exhibit 16 (below with highlighting added).



Furthermore, through hundreds of social media posts, Johnson continues to suggest that January 6, 2021 was staged by the federal government, calling it an "inside job." *See, e.g.*, Exhibit 17; Exhibit 18. Finally, Johnson has called for "j6pt2," a second January 6, 2021 event, if the former president does not win the upcoming 2024 presidential election. *See* Exhibit 20 (below).



Separately, the government identified social media evidence that Johnson was in possession of a firearm in violation of his release conditions. S*ee generally* ECF No. 22 (United States' Motion to Revoke Release Order) (denied by Minute Entry, May 17, 2023); *see also, e.g.*, Exhibit 19 (below).



Finally, Johnson was originally scheduled for a jury trial on February 26, 2024. *See* Minute Order, August 31, 2023. At the pretrial conference on February 22, 2024, Johnson sought a continuance, indicating, through his counsel, that he needed video from his phone seized on January 6, 2021 to properly prepare for trial. Neither the government nor defense had access to the alleged video because the phone was never fully unlocked and remained in the government's possession. In order to get the alleged video, Johnson would provide the password so that the specific videos could be retrieved. Based on this understanding, this Court granted the request, continued the trial to April 15, 2024, and directed the Defendant to provide the password to the government. *See* Minute Entry, February 22, 2024. However, approximately three hours later, Johnson stated on social media that he had no intention of providing the password. *See* Exhibit 15 ("I have to give them the password. Ummm. No."). Johnson never provided the government the password.

*The Charges and Plea*

On December 28, 2022, the United States charged Johnson by a 4-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). *See* ECF No. 10. On April 15, 2024, Johnson pleaded guilty to all counts, the day the case was set for jury trial. *See* Minute Entry, April 15, 2024.

## III.   Statutory Penalties

Johnson now faces sentencing on all four counts. As noted by Probation, Johnson faces up to one year of imprisonment for his violations of 18 U.S.C. §§ 1752(a)(1) and (a)(2) and six months imprisonment for his violations of 40 U.S.C. §§ 5104(e)(2)(D) and (e)(2)(G). He also faces a fine of up to $100,000.

**IV.     The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark." *Id.* at 49.

The government concurs with Probation that the Sentencing Guidelines offense level is 10 but disagrees with Probation on the process to calculate that offense level. The Guidelines set out the specific "order" of the analysis: first, determine the offense guideline; second, determine the base offense level and apply appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3. U.S.S.G. §1B1.1(a)(1)-(3). Then, repeat each step for each count. U.S.S.G. §1B1.1(a)(4). Finally, perform the grouping analysis in Part D of Chapter 3. *Id.*

In the PSR, Probation did not employ this specified procedure to determine the total combined offense level. Rather, the Probation Office started with the grouping analysis in Part D of Chapter 3, ECF No. 48 at ¶ 28, then performed the Guidelines analysis, but only for Count Two, *Id.* at ¶¶ 29–38. Probation calculated the offense level for Count Two as follows:

| Count Two: 18 U.S.C. § 1752(a)(2) | | |
|---|---|---|
| Base Offense Level | U.S.S.G. §2A2.4(a) | +10 |
| Acceptance of Responsibility | U.S.S.G. §3E1.1(a) | 0 |
| **Total Offense Level** | | **+10** |

Probation calculated Johnson's criminal history as a Category II, *id.* at ¶¶ 40–45, and calculated his Guidelines imprisonment range at 8 to 14 months, *id.* at ¶ 86.

The appropriate offense level computations for Count One and Count Two, prior to any grouping analysis under Part D of Chapter 3, are as follows:

Count One: 18 U.S.C. § 1752(a)(1)
| | | |
|---|---|---|
| Base Offense Level | U.S.S.G. §2B2.3(a) | +4 |
| Specific Offense Characteristics | U.S.S.G. §2B2.3(b)(1)(A) | +2 |
| Acceptance of Responsibility | U.S.S.G. §3E1.1(a) | 0 |
| **Total Offense Level** | | **+6** |

Count Two: 18 U.S.C. § 1752(a)(2)
| | | |
|---|---|---|
| Base Offense Level | U.S.S.G. §2A2.4(a) | +10 |
| Acceptance of Responsibility | U.S.S.G. §3E1.1(a) | 0 |
| **Total Offense Level** | | **+10** |

The government agrees with Probation that Johnson is not entitled to the minus-two adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a). *See id.* at ¶ 21. Johnson has not "clearly demonstrate[d] acceptance of responsibility for his offense". *See* U.S.S.G. § 3E1.1(a). As a threshold matter, "[a] defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." *See id.* at cmt. n.3. Furthermore, "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility" is a key consideration. *See id.* at cmt. n.1(H). While Johnson pleaded guilty to all counts, he did so on April 15, 2024, minutes before jury selection, requiring the government to fully prepare for trial. Moreover, Johnson has continued to act in a manner "that is inconsistent with such acceptance of responsibility." *See id.* at cmt. n.3. Johnson calls himself an "American Terrorist" on social media and states that he is a "Proud j6er" in reference to January 6, 2021. *See* Exhibit 16. Moreover, following his guilty plea, he has suggested January 6, 2021 was staged by the federal government, calling it an "inside job". *See* Exhibit 17.

The government agrees with Probation that Johnson is not entitled to the two-level adjustment pursuant to U.S.S.G. § 4C1.1(a)(1), because the defendant was assessed criminal history points. *See* ECF No. 48 at ¶ 37.

The government agrees with Probation that Counts One and Two group because all involve the same victim: Congress. U.S.S.G. §3D1.2(d). The offense level for that Group is the level "for the most serious of the counts compromising the Group, *i.e.*, the highest offense level of the counts in the Group." U.S.S.G. §3D1.3(a). Since Count Two has the highest offense level for any count in the group, the offense level for the group is **10**. Accordingly, the government agrees with Probation that Johnson's Guideline imprisonment range calculation is 8 to 14 months. For the reasons that follow, the government asks this Court to impose a sentence of 12 months of incarceration, in the middle of the range.

While the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.       Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 12 months of incarceration, 12 months of supervised release, a fine of $2,336, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while

staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). Notably, for a misdemeanor defendant like Johnson, the absence of violent or destructive acts is not a mitigating factor. Had Johnson engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Johnson's case is that he rioted amongst the most violent members of the mob on January 6, 2021, near the Lower West Terrace doors known as the "Tunnel". Moreover, Johnson climbed over broken glass to enter the U.S. Capitol Building through an office window that had been smashed out by other rioters, and once inside stated: "We're not done yet. We're not just breaking and entering." *See* Exhibit 7. This should leave no doubt that he was aware of his transgressions. Johnson was not content with breaching the U.S. Capitol Building himself, he waved other rioters in and egged rioters on by blasting music in the chaos outside the Tunnel. Johnson did this in front of police officers in riot gear and with plumes of smoke and chemical irritant in the air. Indeed, Johnson rioted for 4 hours, repeatedly screamed at police officers, and only ceased once he was arrested by police officers for a curfew violation. Moreover, Johnson came to the U.S. Capitol Building prepared for a violent confrontation given that he brought pepper spray. *See* Exhibit 14. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration.

### B.  Johnson's History and Characteristics

As set forth in the PSR, Johnson has a long criminal history. It consists of numerous misdemeanor convictions, ranging from trespass (July 3, 2008), resisting arrest (July 3, 2008, March 30, 2017, and June 3, 2022), communicating threats (March 30, 2017), possession of illicit substances (February 17, 2006), driving under the influence (June 3, 2022), driving with a revoked/suspended license (June 3, 2022), and probation violations (July 3, 2008). *See* ECF No.

48 at ¶¶ 40–45. Johnson also has a felony conviction for the use of a fraudulent identification card (June 3, 2022). *See id.* at ¶ 43. Probation has calculated the total criminal history score as 3 establishing a criminal history category of II.

Moreover, over the course of approximately one year, from May 11, 2023 to June 25, 2024, the Pretrial Services Agency for the District of Columbia ("PSA") identified ten separate instances where Johnson was in non-compliance with his conditions of release. *See* ECF No. 21 (May 11, 2023 violation for address verification and for arrest and charges by Florida local authorities for driving with a suspended license and possession of Cyclobenzaprine, a controlled substance); ECF No. 23 (May 22, 2023 violation for arrest and charge for driving with a suspended license); ECF No. 27 (June 7, 2023 violation for unauthorized possession of a driver's license, resisting an officer, and driving under the influence); ECF No. 29 (July 14, 2023 violation for failure to report a law enforcement contact where Johnson was alleged to have attempted to commit retail theft but did not receive any ticket or citation); ECF No. 31 (December 4, 2023 violation for failure to establish contact with PSA); ECF No. 36 (February 20, 2024 violation for failure to check in with PSA); ECF No. 38 (April 2, 2024 violation for failure to check in with PSA); ECF No. 46 (May 9, 2024 violation for failure to check in with PSA); ECF No. 47 (May 30, 2024 violation for failure to check in with PSA); ECF No. 49 (June 25, 2024 violation for failure to check in with PSA); *see also* ECF No. 48 at ¶ 7; ECF No. 22 (United States' Motion to Revoke Release Order).

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a

16

political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 (statement of Judge Nichols at sentencing).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration, particularly because on January 30, 2024 Johnson called for a second January 6 if the former president does not win in the upcoming 2024 election.

First, as discussed above, Johnson's criminal history category of II, in conjunction with his history of prior arrests and convictions, reveals a clear pattern of disrespect for the law. *See supra* Section V(B); *see also* ECF No. 48 at ¶¶ 40–45. These convictions were serious and troublingly like the crimes Johnson has pleaded guilty to here: His prior conviction ranged from trespass to resisting arrest to communicating threats. Moreover, Probation noted Johnson's repeated non-compliance with his conditions of release. *See id.* at ¶ 7.

 Second, Johnson's post-January 6—and even post-plea—conduct and statements are troubling. Johnson has not taken any steps to denounce his words and actions on January 6, 2021, including to Probation. To the contrary, despite Johnson failing to provide information regarding any social media accounts to Probation, *see id.* at ¶ 62, Probation identified that since his guilty plea, Johnson has continued to call himself an "American Terrorist" on social media and states that he is a "Proud j6er" in reference to January 6, 2021, *see id*. Moreover, Johnson lacked candor to this Court and Probation. Johnson indicated to this Court that he was willing to provide the password to his phone so that the government could retrieve an alleged exculpatory video necessitating a continuance. However, Johnson never provided the government the password and in fact indicated he would not do so a mere three hours after the continuance was granted. *See* Exhibit 15. Additionally, Johnson has failed to return requisite forms and did not provide information for any collateral contact to verify his background information. *See*, *e.g.*, *id.* at ¶¶ 55, 77, 80.

Third, Johnson must be specifically deterred from repeating the events of January 6, 2021. With the 2024 presidential election approaching, a rematch on the horizon, and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6, 2021 looms ominously. The Court must sentence Johnson in a manner sufficient to deter him

specifically, and others generally, from going down that road again. This is not mere speculation, Johnson himself has called for "j6pt2," a second January 6, 2021 event, if the former president does not win the upcoming 2024 presidential election. *See* Exhibit 20. This Court should take Johnson's threats seriously and sentence him to a term of incarceration that will specifically deter Johnson from committing the types of crimes he committed on January 6 in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Johnson based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Johnson pleaded guilty to four Counts: 18 U.S.C. §§ 1752(a)(1), (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D), (e)(2)(G). These offenses are Class A and B misdemeanors, respectively. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see id.* ("A

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).”). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 (“If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.”) (statement of Judge Pan).

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Nassif*, 21-cr-421 (JDB), Nassif was convicted of the same four misdemeanor charges of which Johnson pleaded guilty. The evidence showed that Nassif repeatedly walked past obvious signs that the Capitol building and grounds were restricted and he entered the building through the Rotunda doors with glass visibly broken. Nassif chanted “Whose House? Our House!” outside the doors and told rioters to “keep fighting!” Nassif saw officers guarding the building but entered anyway. After January 6, 2021, Nassif spread false information about the riot via social media. Nassif did not express remorse for his conduct. The court applied an obstruction of justice increase due to what it considered false testimony and sentenced Nassif to seven months of imprisonment along with 12 months of supervised released. The court varied downward slightly because Nassif, *inter alia*, was not aggressive and had served in the military. *See id.*, Sentencing Tr. Apr. 27, 2023 at 76.

While Nassif simply walked past numerous signs that the Capitol building and grounds were restricted and entered the building anyway, Johnson took it significantly further, climbing through a broken window to breach the U.S. Capitol building. Moreover, Nassif and Johnson both

ignored the alarms sounding, chemical irritant in the air, and officers standing guard. Like Nassif, Johnson egged on rioters. Additionally, like Nassif, Johnson has not expressed remorse for his conduct and spread false information about the riot on social media. *See* Exhibit 17, Exhibit 18. Unlike Nassif, Johnson was aggressive towards police officers. And, unlike Nassif who had no prior convictions, Johnson has a criminal history category of II, brought pepper spray to the U.S. Capitol Building, and has a laundry list of pretrial violations, and therefore is deserving of a punishment greater than the seven months of incarceration Nassif received.

Next, in *United States v. Ballenger*, 21-cr-719 (JEB), following a bench trial, this Court convicted Ballenger of the same four misdemeanor charges in question. Your Honor sentenced Ballenger to four months of incarceration and nine months of supervised release, in part because she brought weapons to the U.S. Capitol Building, including a pocketknife and pepper spray, *see id.*, Trial Tr. Mar. 21, 2023 at 74, 167, and was found to be "incredible" when testifying, *see id.* at 170. Johnson's misconduct was substantially worse than Ballenger and given his long criminal history he deserves a greater punishment.

Like Ballenger, Johnson brought pepper spray to the U.S. Capitol Building. *See* Exhibit 14. Unlike Ballenger who had her offense level increased by 2 levels due to her incredible testimony, Johnson did not take the stand. However, Johnson has misled PSA, this Court, and Probation. He regularly failed to disclose law enforcement contacts to PSA. This Court granted his request to continue his trial on the condition that he cooperate with the government to unluck his phone for alleged exculpatory evidence—but hours later, Johnson proclaimed on social media he had no intention to do so. He failed to return requisite forms to Probation to verify his background information, and despite failing to provide information regarding any social media accounts, Probation identified that since his guilty plea, Johnson has used social media to communicate

threats, prolifically spread false information about January 6, 2021. Moreover, after his arrest, Johnson called for a second January 6. Unlike Ballenger who entered through the Senate Wing Door, Johnson climbed through a broken window. Moreover, Johnson engaged in numerous aggressive, verbal altercations with police officers and rioted for over four hours until arrested for a curfew violation. Johnson's substantially worse misconduct on January 6, 2021 deserves greater punishment, given the near identical guidelines range.

Finally, in *United States v. Rivera*, 21-cr-60 (CKK), following a bench trial, the defendant was convicted of the same four misdemeanor charges of which Johnson pleaded guilty. The evidence showed that, on January 6, 2021, Rivera ignored numerous signs indicating he should not have been on Capitol grounds. Rivera recorded rioters making their way through the police line on the Lower West Terrace and announced to his social media following that officers were firing pepper spray at the rioters. Rivera saw rioters climbing a wall and shouted at them, "there's an easier way to get up!" Rivera also watched as rioters breached the Parliamentarian's door. Rivera entered the building through a window next to the Senate Wing Door. After January 6, Rivera did not express remorse or contrition for his actions; instead, he celebrated his participation on social media. The court sentenced Rivera to eight months of incarceration and 12 months of supervised released.

Like Rivera, Johnson took numerous videos and photos of the chaos at the Capitol on January 6, 2021. Worse than Rivera who observed breaches at the Senate Wing Door, a relatively less violent area, Johnson watched as rioters battled police officers in the Tunnel, where some of the most violent confrontations occurred. Like Rivera, Johnson encouraged other rioters by playing loud music on a boombox. *See* Exhibit 9. Also like Rivera, Johnson noticed that chemical irritant was being used to keep rioters out of Lower West Terrace but nevertheless verbally accosted police

officers while trespassing. *See* Exhibit 10. Johnson similarly has not expressed remorse for his conduct and has celebrated his participation on social media like Rivera. *See* Exhibit 16 (calling himself an American Terrorist and "proud J6er"). Because Rivera's criminal history was a Category I, a greater sentence of 12 months is warranted for Johnson.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.    Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d

at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Johnson was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C.

2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[4]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *see also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Johnson to pay $500 in restitution for his convictions on Counts 1 and 2. This amount fairly reflects Johnson's role in the offense and the

---

[4] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    Fine

The defendant's convictions subject him to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). "In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'" *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994).

Here, the defendant has not shown an inability to pay (at the very least the funds he has raised through crowdsourcing accounts discussed below). Johnson has self-reported a monthly positive cash surplus of $1,400. *See id.* at ¶ 79.[5] Thus pursuant to the considerations outlined in

---

[5] Probation provided the Net Worth Statement and Monthly Cash Flow Statemen prior to the presentence interview, however Johnson did not return them to the Probation Office. *See* ECF No. 48 at ¶ 77. Johnson reported to Probation a monthly income of $2,000 and expenses totaling

U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $4,000–$40,000. U.S.S.G. § 5E1.2(c).

Indeed, a fine of $2,336 is supported in this case, because Probation has identified two crowdsourcing fundraising platforms associated with Johnson. ECF No. 48 at ¶ 81 ("As of June 14, 2024, one account had raised $211.00 and the second account raised $2,125.00."). One of those accounts describes Johnson as a political prisoner. *See* Exhibit 21 ("Jan 6th Political Prisoner Andrew Johnson"). Specifically, along with a unique "Cash App" identifier for donations, Johnson has promoted both crowdsourcing fundraising accounts identified by Probation on his social media by linking to them on his profile. *See* Exhibit 17 (referencing https://www.givesendgo.com/andrewjohnson); Exhibit 22 (referencing https://www.givesendgo.com/FreeJohnson). Johnson requested and was granted court-appointed representation at no cost to him. Accordingly, given that he has capitalized on his crimes and false information that he is a "political prisoner," this Court should fine Johnson the amount he fundraised. While Probation indicated that "[b]ased on the financial information available, the defendant does not appear to have the ability to pay a fine," *see* ECF No. 48 at ¶ 83, Johnson has chosen not to return financial disclosures restricting the information available to Probation, *see id.* at ¶¶ 77, 80.

### VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence the defendant to 12 months of incarceration, 12 months of supervised release, a fine of $2,336, and $500 in restitution. Such a

---

$600 per month. *See id.* at ¶ 79. Johnson did not return the financial release of information form, so Probation could not generate an Equifax credit report but Accurint records did not reveal any additional debt. *See id.* at ¶ 80.

sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Johnson's liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:

*/s/ Pavan S. Krishnamurthy*
PAVAN S. KRISHNAMURTHY
Assistant United States Attorney
D.C. Bar No. 252831
601 D Street NW
Washington, DC 20001
(202) 252-7862
pavan.krishnamurthy@usdoj.gov

*/s/ Rebekah E. Lederer*
REBEKAH E. LEDERER
Assistant United States Attorney
Pennsylvania Bar No. 320922
601 D St., NW
Washington, D.C. 20001
(202) 252-7012
rebekah.lederer@usdoj.gov